IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of<br><br>C.S. | No. 80655-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — C.S. appeals an order involuntarily committing them[1] to 90 days of outpatient mental health treatment. Substantial evidence supports the trial court's finding that C.S. presented a likelihood of serious harm to self but does not support the trial court's finding that C.S. was gravely disabled as defined in former RCW 71.05.020(22) (2019). We affirm in part, reverse in part, and remand for the Superior Court to strike the gravely disabled finding.

FACTS

On July 24, 2019, C.S., then 47 years old, sought help at the emergency department at the University of Washington Medical Center (UWMC). A designated crisis responder at UWMC filed a petition for C.S.'s initial detention stating that she believed that C.S.'s actions constituted a likelihood of serious harm to themself or others or that they are gravely disabled.

---

[1] The record reflects that C.S. prefers the pronouns "they/them/their." We defer to C.S.'s preferred pronouns.

Citations and pin cites are based on the Westlaw online version of the cited material.

By a declaration attached to the petition, an emergency department social worker stated:

> [C.S.] exhibits evidence of a mental disorder including suicidal ideation, homicidal ideation, paranoia, grandiosity, increasing hopelessness, anhedonia, decreased sleep, decreased appetite, and decreased energy.  I am concerned for [C.S.]'s health and safety due to self-report of recent suicide attempt by overdose on alcohol and benzodiazepines with no emotional response 4 days prior, increasing suicidal ideation with plan and means to cut self, homicidal ideation to kill Christians that they feel persecuted by, relocating to multiple cities to flee persecution, and discontinuing psychiatric medications for unclear reasons,  [C.S.] endorses financial means to purchase P25 air gun and knives with plan to shoot identified Christians on the streets.  After shooting individuals with [an] air gun, [C.S.] plans to 'slit their throats'.  [C.S.] reports they are able to identify Christians persecuting them by their tone of voice…

C.S. was subsequently transferred to Fairfax Hospital (Fairfax) for treatment.

On July 29, 2019, staff from Fairfax filed a petition requesting that C.S. be detained for 14 days of involuntary treatment.  The petition stated that staff at Fairfax found that as a result of a mental disorder C.S. presented a likelihood of serious harm to self and a likelihood of serious harm to others and/or others' property.  To support this finding, the petition reiterated the same facts set forth in the petition for initial detention, detailed above, and added the fact that C.S. insisted their name is "Rachel Moore" and that they had never gone by C.S.  The petition stated that there were no less restrictive alternatives to detention in the best interest of C.S. or others because C.S. required the monitoring and stabilization of an inpatient psychiatric hospital.

A hearing on the State's petition took place on September 13 and 17, 2019.[2] The State proceeded on the allegation of the likelihood of serious harm to self and orally amended the petition to include that C.S. was gravely disabled as defined in prong (a) of former RCW 71.05.020(22). The State did not proceed with the allegation that C.S. presented a likelihood of serious harm to others and/or others' property.[3] The State requested that the court order 90 days of outpatient treatment as a less restrictive alternative treatment rather than detention for 14 days as requested in the petition. Three people testified at the hearing: C.S.; Dr. Neal Palmreuter, psychiatrist at Fairfax; and Hyemin Song, custodian of records and court evaluator at UWMC.

At the conclusion of the hearing, the court found that C.S. was suffering from a mental disorder—specifically, "an emotional impairment diagnosed at this point in time as unspecified schizophrenia spectrum with related disorders . . ." The court further found that as a result of this mental disorder, C.S. presented a substantial risk of serious harm to self and was gravely disabled under prong (a) of the statutory definition. The court granted the State's request for a less restrictive alternative of a 90-day outpatient treatment.

---

[2] C.S. does not contest the timing of the hearing. The record is devoid of any record of continuances other than the State explaining that C.S. sought numerous continuances and the State agreed. And the appellant's brief states the hearing was held "after several continuances."

[3] The State explained at the hearing that they were not proceeding with the allegation of harm to others because, although Dr. Palmreuter still had this concern from a clinical perspective, from a legal perspective the State could not prove that any of the three alternative behaviors legally required to demonstrate a risk of harm to others.

3

The next day, the court entered a written order entitled Findings of Fact, Conclusions of Law, and Order Committing Respondent for Involuntary Treatment, which reflected the court's oral rulings.

Two months later, on November 19, 2019, the court entered supplemental findings of fact and conclusions of law pursuant to LMPR 1.11. These supplemental findings and conclusions are consistent with the court's earlier findings and conclusions.

C.S. appeals.

DISCUSSION

Our review of the trial court's ruling on involuntary commitment is limited to determining whether substantial evidence supports the findings and, if so, whether those findings support the conclusions of law and judgment. In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998). "Substantial evidence is 'evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.' " Id. (quoting Holland v. Boeing Co., 90 Wn.2d 384, 390, 583 P.2d 621 (1978)). The burden is on the challenging party to demonstrate that substantial evidence does not support a finding of fact. Id.

A court may order a person held for 14 days of involuntary treatment or 90 days of less restrictive alternative treatment when the State has demonstrated by a preponderance of the evidence that, as a result of a mental disorder, the person presents a likelihood of serious harm to self or is gravely disabled. Former RCW 71.05.240(1), (3) (2019).

In this case, C.S. does not appeal the court's finding that they have a mental disorder. Thus, the issues on appeal are whether C.S. presented a likelihood of serious harm to self and whether C.S. was gravely disabled.

Harm to Self

C.S. challenges the court's finding that C.S. presented a likelihood of serious harm to self. "Likelihood of serious harm" is defined in relevant part as a "substantial risk" that "physical harm will be inflicted by a person upon his or her own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on oneself…" Former RCW 71.05.020(35). Our Supreme Court has interpreted RCW 71.05.020 "as requiring a showing of a substantial risk of physical harm as evidenced by a recent overt act. This act may be one which has caused harm or creates a reasonable apprehension of dangerousness." In re Harris, 98 Wn.2d 276, 284-85, 654 P.2d 109 (1982). We do not review a trial court's decision regarding witness credibility. In re Det. of H.N., 188 Wn. App. 744, 763, 355 P.3d 294 (2015).

Song testified that UWMC records from the day C.S. arrived at the UWMC emergency room, July 24, 2019, indicate that C.S. presented with suicidal ideation and a history of suicide attempts.

Regarding suicidal ideation, Song testified the records stated that C.S. "presents to [UWMC] emergency room due to suicidal ideation without plan" and "Patient endorses increasing suicidal ideation . . . Patient endorses suicidal ideation with a plan. Cut self, stating . . . 'I don't want to live anymore.' "

5

Regarding suicide attempts, Song testified that the UWMC records stated that C.S. endorsed "attempting suicide by vodka and Klonopin . . . [p]atient endorses awaking from suicide attempt and feeling . . . stunned . . . that they survived." The records further stated that C.S. endorsed two other previous suicide attempts: C.S. endorsed "a history of suicide attempts, unable to produce. States of drowning in ice water . . . and crashed car into cement wall"

On cross-examination, Song testified that the July 24 report also stated that C.S. reported suicidal ideation "two days ago" but denied such in hospital and denied a suicide plan currently.

Dr. Palmreuter opined at hearing that C.S. presented a substantial risk of physical harm to self as evidenced by threats or attempts to commit suicide or inflict harm on one's self. He explained that he had been treating C.S. since they were hospitalized at Fairfax around July 25 or 26; he said he interacted with C.S. every weekday as well as one weekend per month. Dr. Palmreuter said C.S. repeatedly stated their intent to stop medication and treatment after being discharged from the hospital. He characterized C.S.'s insight into the need for treatment as "quite poor."

Dr. Palmreuter repeatedly stated that his main concern in regard to C.S. harming themselves was their three past suicide attempts, including one "very recent" attempt. " . . . [T]he main thing that concerns me about harm to self is what was mentioned early in her treatment about her two prior suicide attempts before the recent string of hospitalizations, and then the overdose with the Clodine or Clozapine and alcohol . . . There has been a very recent suicide

6

attempt and then two prior suicide attempts." Dr. Palmreuter testified that one of the most reliable indicators to look toward to determine if someone is at risk of harming themselves is "past action. And so, in this case, the three prior suicide attempts are . . . one of the most reliable things that helps to predict future behavior or action."

Dr. Palmreuter expressed concern that C.S. repeatedly refused to answer questions from the staff at Fairfax about whether they were having suicidal thoughts even refusing to answer such questions as recently as the day before his testimony. He explained that because off this refusal there were repeated days, including recently, where he had no information that could help him determine if C.S. was having thoughts of suicide.

C.S. testified that they had not had any thoughts of hurting themself recently. C.S. testified that the first two suicide attempts mentioned occurred in 2006 and 2008. C.S. explained that they sometimes did not want to talk to the Fairfax staff about this issue because they did not like thinking about these previous suicide attempts and because they had experienced multiple occasions where things that they said were "truncated" and "taken out of context to prove a point that is not true." Despite evidence to the contrary, C.S. said the last time they had suicidal thoughts was about four or five days before they left San Francisco. Though C.S.'s attorney attempted to reorient C.S. to the thoughts of suicide at the time they self-presented at UWMC, C.S. said they were treated for mental and physical exhaustion and not for being suicidal.

In short, UWMC records show that C.S. reported suicidal ideation when they self-presented at the emergency room on July 24. C.S. had a self-reported history of at least three suicide attempts, including a "very recent" attempt; Dr. Palmreuter testified this past action was one of the most reliable indicators to look toward to determine if someone is at risk of harming themself. Dr. Palmretuer, who interacted with C.S. very frequently, testified that C.S. repeatedly stated their intent to stop medication and treatment after being discharged from the hospital and that their insight into the need for treatment was "quite poor." C.S. refused to answer hospital staff questions regarding whether they were having suicidal thoughts. Though C.S. denied being suicidal at the hearing, this was in light of C.S. not recognizing or acknowledging her most recent suicidal attempt and ideation. The trial court was in the best position to weigh the credibility of C.S. while considering evidence of C.S.'s recent overt act of self-harm. This evidence is sufficient to persuade a fair-minded person that C.S. presented a likelihood of serious harm to self. See In re Det. of A.S., 91 Wn. App. at 162.

Substantial evidence supports the trial court's finding that C.S. presented a likelihood of serious harm to self.

Gravely disabled

C.S. challenges the court's finding that C.S. was gravely disabled under prong (a) of the statutory definition. "Gravely disabled" is defined in relevant part as "a condition in which a person, as a result of a mental disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her

8

essential human needs of health or safety . . ." Former RCW 71.05.020(22). "[T]he State must present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded." In re LaBelle, 107 Wn.2d 196, 204-05, 728 P.2d 138 (1986).

When C.S. self-presented at the UWMC emergency department on July 25, the record shows that they had been awake for days (about 70 hours) and had not eaten for days. C.S. also reported to UWMC that they were not currently taking their medication consistently due to feeling unsafe.

Dr. Palmreuter opined that C.S. was in danger of serious physical harm from a failure or inability to provide for their essential needs of health or safety. He said C.S. repeatedly stated, as recently as about two weeks prior to the hearing, their intent to stop medication and treatment after being discharged from the hospital. He said C.S. repeatedly stated their plan to go live in the woods "which I'm concerned that [C.S.] might not be able to safely manage or care for [themself] given those plans." Dr. Palmreuter testified that it was "quite likely" that if C.S. left the hospital without mandatory court-ordered outpatient treatment that C.S. would deteriorate to a similar state that brought them into the hospital initially.

On the other hand, Dr. Palmreuter testified that C.S. was stable enough to be considered for discharge as long ago as August 23 on a less restrictive order and they had begun planning treatment in advance of that date, including

connecting C.S. with an outpatient mental health treatment provider. Dr. Palmreuter testified that C.S.'s appetite and sleep in the hospital were both generally noted to be good or fair.

Regarding their plans upon discharge from the hospital, C.S. testified that they had not decided between continuing care under a doctor they trusted in Minnesota or camping in the Olympic National Forest saying, "I guess I just haven't decided. It's a coin toss as to where my heart is on that."

However, C.S. showed some insight into the fact that it would be in their best interest to continue treatment with the doctor they trusted in Minnesota stating, "I entrust and believe in my doctor in Duluth, Minnesota. And all things considered—although, I would like to go on a camping vacation here—I think it would be in my best interest to go back to Duluth, Minnesota and resume care under him." C.S. also testified that the option to camp in the forest was "an option that I don't necessarily think is a great idea right now." C.S. said that if their doctor in Minnesota wanted them to continue taking the antipsychotic medication they were currently taking or another antipsychotic medication, they would take the medication.

Overall, the primary evidence here that C.S. was in danger of serious physical harm resulting from a failure to provide for their essential human needs of health and safety was C.S.'s condition upon arrival to the UWMC, combined with Dr. Palmreuter's opinion that C.S.'s condition would deteriorate to that same state if released without court-ordered outpatient treatment. Although Dr. Palmreuter said C.S. had repeatedly stated in the past that they would

discontinue treatment and medication and treatment upon discharge from the hospital, C.S. testified at the hearing that they would take their medication. And the record shows that at the time of hearing, C.S.'s appetite and sleep were fair to good. The State points to the fact that C.S. was considering camping, but C.S. testified that they were an experienced camper having camped for 20 months, including two winters, at a campsite in New York. Under these circumstances, the mere fact that C.S. might camp did not pose a danger of serious physical harm to C.S.. See LaBelle, 107 Wn.2d at 217 (appellant's occasional overnight stays in parks were infrequent and not shown to present a substantial risk of danger of serious physical harm).

The evidence here was not sufficient to persuade a fair-minded person that, at the time of hearing, C.S. was in danger of serious physical harm resulting from a failure to provide for their essential human needs of health and safety. Substantial evidence does not support the trial court's finding that C.S. was gravely disabled.

We affirm in part, reverse in part and remand to the trial court to strike the finding of gravely disabled.

_____
Coburn, J.

WE CONCUR:

_____          _____
                                        Andrus, A.C.J.

11